UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

LAMAR LYMAN, an
Individual,

and                                                          Case No. 1:23-cv-

FAIR HOUSING CENTER OF METROPOLITAN
DETROIT, a nonprofit corporation
Plaintiffs,                                                   .

vs.

**COMPLAINT**

MONTCLAIR AT PARTRIDGE CREEK, LLC.,
a corporation, and

MOCERI MANAGEMENT CO. INC.,
a corporation,

Defendants.

| William F. Piper (P38636) | |
| William F. Piper, P.L.C. | |
| Attorney for Plaintiff | |
| 1611 West Centre Avenue, Suite 209 | |
| Portage, MI 49024 | |
| Phone: 269.321.5008 | |
| Fax: 269.321.5009 | |

The plaintiffs, by and through their attorney William F. Piper, PLC., for their complaint, state

as follows:

### JURISDICTIONAL ALLEGATIONS

1.      The plaintiff Lamar Lyman is an individual who currently resides in the City of Redford,

County of Wayne, State of Michigan.

2.      The plaintiff Fair Housing Center of Metropolitan Detroit is a non profit corporation that

does business in the County of Macomb, State of Michigan, and other counties.

1

3.      The defendant Montclair at Partridge Creek, LLC., is a corporation doing business in Clinton

Township, County of Macomb, State of Michigan.

4.      The defendant Moceri Management Co, Inc., is a corporation that managed Montclair at

Partridge Creek, LLC., at all times relevant to this complaint.

5.      This matter arose in Clinton Township, County of Macomb, at Montclair at Partridge Creek,

which the defendants owned or operated, or both, upon information and belief, and they

applied their no felony convictions policy regarding tenant eligibility there.

6.      This matter arises under the Fair Housing Act of 1963, as amended, 42 U.S.C. §3601 et. seq.

7.      Certain claims in this action arise under this court's supplemental jurisdiction to hear and

decide state law claims arising out of the same transactions and occurrences as the federal

law claims.

## COMMON ALLEGATIONS

8.      The plaintiff restates and realleges as though fully set forth herein paragraphs 1 – 7 of this

complaint.

9.      The plaintiff Lamar Lyman is African-American, and he has had one felony conviction in his

life, which occurred in Texas in March 2011.

10.     After his release from prison in 2018 Mr. Lyman has rehabilitated, and he currently has a job

as a supervisor in a health care organization, and he has good credit.

11.     In late April or early May 2022 Mr. Lyman visited the defendants' premises at Montclair at

Partridge Creek.

12.     Mr. Lyman applied for an apartment, paying a $50.00 application fee.

13.     The defendants did a criminal background check on Mr. Lyman through its regular agent for

doing it, and it was clear of criminal convictions.

14.     Upon information and belief, someone went online to look up Mr. Lyman and found his

felony conviction.

15.     On June 9, 2022 the defendants' agent Martha told Mr. Lyman that the defendants could not lease to him because of the results of his criminal background check.

16.     Upset, Mr. Lyman called back.

17.     The defendants' agent Martha told Mr. Lyman again that they could not lease to him because of the results of his criminal background check

18.     The defendants' agent Martha told Mr. Lyman that if they deviated from their policy of not accepting anyone with a criminal conviction they would be engaging in discrimination, and they do not consider cases individually.

19.     The defendants' agent Martha also told Mr. Lyman that otherwise his application was fine, and his criminal conviction was the only reason he was rejected.

20.     On August 11, 2022 an African-American tester for the Fair Housing Center of Metropolitan Detroit called Montclair at Partridge Creek Apartments to check on the availability of one or two bedroom apartments for her nephew.

21.     An agent for the defendant self identified as Andrea told the tester that 2 bedroom ranch units would be available on October 20 and October 31, 2022 for $2,330 and $2,450 a month respectively.

22.     Andera than asked the tester when her nephew wanted to move in, and the aforementioned tester said in 30 days. Andrea gave the tester the telephone number to their community in Oakland County – Tribute Creek.

23.     The tester then informed Andrea that her nephew had a felony that was 22 years old but that since then he had obtained an engineering degree and works at Ford Motor Company.

24.     Andrea informed the tester that they do background checks on all applicants, no matter how old.

25.     Andrea asked the tester if the criminal conviction was a felony, and she answered, "Yes."

26.    Andrea then asked the tester to hold. After a little while, Andrea came back and told the tester that her nephew would not be allowed.

27.    This policy or practice of the defendants of automatically excluding people with felony convictions from a tenancy is absolute and does not permit exceptions, regardless of the nature of the conviction, the age of it, evidence of rehabilitation or any other factor bearing upon whether the person is a threat to safety or property or has the ability to pay.

28.    As a result of the aforementioned policy or practice, prospective tenants at Montclair at Partridge Creek Apartments are either deterred from applying for a tenancy or automatically denied after spending money on an application because of the no felony convictions policy or practice.

29.    Since 1980, the number of persons in incarcerated in prison in the United States has grown from 300,000 to more than 1.3 million today.

30.    At the same time as the sheer numbers of people with criminal convictions has substantially increased, it has become much easier for housing providers to identify and ban people from housing because of criminal convictions because of the digitalization of records and the growth of private companies that provide inexpensive background checks on prospective tenants.

31.    The massive increase of incarceration and the number of people with criminal records has had an unequal impact on African-Americans.

32.    African-Americans are incarcerated at rates that are disproportionate to the numbers in the United States' general population. African-Americans, in 2018, comprised approximately 32.8% of all prisoners, but only make up approximately 12.00% of the United States' adult population, according to U.S. census Bureau of Justice Statistics.

33.    According to the sentencing project, the white imprisonment rate for the State of Michigan,
       was 253 per 100,000 in 2014, while the corresponding rate for African-Americans was 1,682
       per 100,000.

34.    That African-Americans are far more likely than whites to have a criminal record means that
       African-Americans are much more likely than whites to be excluded from housing by
       automatic exclusion of people with criminal records.

35.    In April 2016, the U.S. Department of Housing and Urban Development ("HUD") issued
       interpretive guidance confirming that automatic bans, like the defendants' no felony policy
       have a disproportionate adverse effect on African-Americans because of disparities in the
       criminal justice system; moreover, HUD's guidance cautioned that automatic bans, which
       categorically exclude applicants because of their criminal history, are *never* necessary to
       achieve the potentially legitimate interest of protecting safety or property. See (HUD, *Office
       of Gen. Counsel Guidance on Application of FHA Standards to the Use of Criminal Records
       by Providers of House. and Real Estate-Related Transactions*) ("HUD Guidance") (Apr. 4,
       2016) at 2-7. The HUD Guidance further explains that this applies to automatic bans based
       either on arrests or convictions. *Id.*[1]   This policy has been recently revised and strengthened.

36.    Studies have shown that although African-Americans and whites use illegal drugs at the same
       general rate, African-Americans are systematically more likely to be arrested and prosecuted
       for such use. Given the "war on drugs", this has resulted in disproportionate conviction rates
       of African-Americans for illegal drug offenses relative to whites.

37.    The Equal Employment Opportunity Commission's ("EEOC") analysis of the impact of
       automatic criminal history bans in the employment context further confirms the disparate

---

[1] The HUD Guidance explains the appropriate analysis in detail but does not change the law; automatic bans violate
the Fair Housing Act independent of the Guidance. See *Jackson v. Tyron Park Apartments, Inc.*, No. 6:18-CV-
06238 EAW, 2019 WL 331635, at *3-5(W.D.N.Y. Jan. 25, 2019).

impact described here. The EEOC analyzed national criminal records data and concluded that automatic criminal history bans have a disparate impact on the basis of race, and it documented its findings in its Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions Under Title VI of the Civil Rights Act of 1964 ("Enforcement Guidance"). [2]

38.   The EEOC's conclusion applies to the disparate impact analysis here because categorical criminal records bans operate the same way in housing as they do in employment. In both contexts, applicants are informally and permanently excluded, whether from housing opportunities or employment, before due consideration of the merits or qualifications of the applicant for housing or a job in question and without any individualized assessment of whether their criminal history makes them personally unqualified. They are excluded based solely on the fact of a prior conviction or even a pending criminal charge, regardless of whether they pose a current risk.

39.   African-Americans seeking to rent an apartment unit at Montclair at Partridge Creek are substantially more likely than whites to be harmed by the defendants' blanket no felony convictions policy irrespective of the exact boundaries of the rental market.

40.   The defendants' refusal to provide housing to people with felony convictions directly causes a racially disparate, adverse impact on African-Americans, and it specifically adversely affected Mr. Lyman.

41.   Extensive research establishes that protecting safety and property does not justify a blanket criminal records policy. The research shows that additional factors, such as the amount of

---

[2] 2012 WL 1499883 (Apr. 25, 2012). The prior versions from 1987 and 1990 reached the same conclusion and set forth the same presumption. 7

time since the last offense, the person's age, and the type of conviction, must be considered to assess whether a past criminal conviction suggests a risk of future criminal conduct.

42. The amount of time since the last offense is a critical factor in making this assessment. Studies show that in seven years or even fewer, the risk of future arrest for somebody with a past conviction becomes no greater than the risk for somebody without a past conviction.[3] One more recent study found that negative outcomes in rental housing specifically are no more likely once a criminal conviction is five years old and once a misdemeanor conviction is just two years old.[4]

43. The rental housing study also demonstrated that the type of conviction is important in predicting whether a person's criminal record indicates a heightened risk.[5]  It found that for 11 out of 15 categories of crime studied there is no statistically meaningful increase in negative outcomes for renters with a past conviction in comparison to renters without a criminal history. These 11 categories include minor drug offenses, prostitution, alcohol related offenses, and minor public disorder offenses. The increase in the other four categories is small, and, as explained above, disappears over time.

44. Studies show that a person's age and frequency of past criminal activity are also key factors in determining whether the individual poses any risk to safety or property.[6]  People with a criminal record who are older, and those with fewer criminal offenses, are much less likely to engage in future criminal conduct or pose a threat to the community.

---

[3] Megan C. Kurlychek et al*., Scarlet Letters and Recidivism: Does an Old Criminal Record Predict Future Offending?* 5 Criminology and Pub. Pol'y 483 (2006). *See also* Alfred Blumstein and Kiminori Nakamura, *Redemption in the Presence of Widespread Criminal Background Checks*, 47 Criminology 327 (2009)

[4] Cael Warren, Success in Housing: How Much Does Criminal Background Matter?, Wilder Research (2019), https://www.wilder.org/sites/default/files/imports/AEON_HousingSuccess_CriminalBackground_Report_1-19.pdf.

[5] *See Id.*
[6] See Shawn Bushway et al., The Predictive Value of Criminal Background Checks: Do Age and Criminal History Affect Time to Redemption?, 14 Criminology 27, 52 (2011).

45.    Accordingly, concerns about safety and the protection of the property do not provide a substantial and legitimate rationale for a broad blanket ban on eligibility like the defendants' no felony convictions policy.

46.    Giving individualized consideration to each potential resident's circumstances is a less discriminatory alternative to a no felony convictions policy and would address any substantial, legitimate, nondiscriminatory justification for the policy.

47.    Specifically, to the extent that public safety or protection of property at Montclair at Partridge Creek is a valid justification, this can be accomplished through the use of individualized assessments that consider the nature of an individual's conviction, the amount of time since the conviction or release, and the evidence of rehabilitation, among other factors. An individualized assessment allows people with a criminal record, but who pose no realistic current or future threat to the community, to obtain housing. This more tailored approach both protects public safety and property and is less discriminatory and exclusionary because it reduces the number of African-American applicants who are categorically banned from Montclair at Partridge Creek.

48.    The HUD Guidance Expressly calls for the use of individualized consideration as a less discriminatory alternative to an automatic exclusion on the basis of criminal history, through consideration of factors such as "the facts or circumstances surrounding the criminal conduct; the age of the individual at the time of the conduct; evidence that the individual has maintained a good tenant history before and/or after the conviction or conduct; and evidence of rehabilitation efforts."[7]

---

[7] *See* HUD Guidance at 7

49.    In the analogous employment context, the EEOC recognizes that individualized assessments are almost always required by law because they provide a less discriminatory alternative to automatic criminal history bans and are sufficient to protect legitimate interests, including safety. Specifically, the EEOC Enforcement Guidance advocates the use of "a targeted screening considering at least the nature of the crime, the time elapsed, and the nature of the job." [8]

50.    This screening should include "notice to the individual that he has been screened out because of a criminal conviction; an opportunity for the individual to demonstrate that the exclusion should not be applied due to his particular circumstances; and consideration by the employer as to whether the additional information provided by the individual warrants and exception to the exclusion and shows that the policy as applied is not job related and consistent with business necessity." [9]

51.    The defendants' overly broad ban against renting to persons who have felony convictions prevents any individualized consideration. Because the defendants would not have to compromise any legitimate concerns that they may have by giving individualized consideration to applicants' particular circumstances and allow those individuals whose tenancy would not threaten public safety or a property interest to live at Montclair at Partridge Creek, the defendants' policy of automatically excluding people with criminal convictions is not necessary to achieve a substantial and legitimate business interest.

52.    Several factors strongly indicate that the real reason the defendants adopted the no felony convictions policy was not to protect safety or property, or for any other substantial and legitimate reason, but to reduce the number of African-American people who are eligible to

---

[8] Enforcement Guidance at 14
[9] *Id.*

9

become tenants. Specifically, the defendants' decision to maintain a far reaching no felony convictions policy, despite the housing industry's rejection of such policies precisely because of their discriminatory impact, suggests that this policy was intended to limit the number of African-Americans living at Montclair at Partridge Creek. So too is the research regarding Mr. Lyman's felony convictions beyond the contracted agent's initial background check. Any such purported justification is actually a pretext for intentional racial discrimination.

53.    Intentional discrimination may be inferred from a number of factors, including whether the challenged action weighs more heavily on one group than another, whether there have been changes in normal procedures, and whether there have been substantive departures from usual practices. [10]

54.    The statistical disparities here are extraordinary. That is, the difference in the rates at which prospective African-American tenants are adversely affected by the policy is dramatically larger than the rate at which prospective white tenants are affected. This is not a situation where a facially neutral policy harms minorities 10% or 20% more frequently than it harms non-minorities. Rather, as shown above, otherwise qualified African-Americans are at least two times more likely that whites to be barred from Montclair at Partridge Creek because of the defendants' no felony convictions policy. Moreover, these dramatic disparities are entirely foreseeable because of well known disparities in the criminal justice system. As the Supreme court has explained, large statistical disparities are "often a telltale sign of purposeful discrimination[.]" [11]

55.    The HUD Guidance was released over six years ago, in April of 2016, and it has been well publicized to housing providers. Major industry organizations including the National

---

[10] *Vill. Of Arlington Heights v Metro. Dev. Corp*., 429 U.S. 252 (1977).

[11] *Int'l Bhd. Of Teamsters v United States,* 431 U.S. 324, 339 n.20(1977).

multifamily Housing Council, the National Apartment Association, and the National Association of Realtors, as well as local organizations, all disseminated information about the HUD Guidance and emphasized the importance of dispensing with automatic criminal history bans. [12]

56. The Guidance is not ambiguous; it clearly explains how broad based criminal background policies that rely on criminal histories cause a disparate impact on people of color, how automatic blanket bans that categorically exclude applicants as a result of their criminal history are not necessary to satisfy a legitimate business interest, and that giving individualized consideration to applicants based on factors such as the nature of conviction and evidence of rehabilitation is a less discriminatory alternative that satisfies legitimate interests in protecting safety and property.

57. Accordingly, on information and belief, the defendants are aware of the disparate and discriminatory impact that their no felony convictions policy has on African-Americans, and they are aware of a less discriminatory approach to screening potential tenants-individualized assessment of the potential tenant's criminal history, based on the factors identified above-that would not only protect their safety and property interests but would also comply with the federal Fair Housing Act and State HUD's Guidelines and with state law. However, despite this knowledge and awareness, the defendants maintain exactly the type of policy that the HUD Guidance rejects. The defendants deliberately chose to implement and maintain the more discriminatory method for criminal records screening that automatically excludes a greater number of prospective tenants who are African-American. One can infer from this

---

[12] Nat'l Ass'n of Realtors, *What the Latest Fair Housing Guidance on Criminal Background Checks Means for Real Estate* (May 13, 2016), https://nar.reltor/newsroom/what-the-latest-fair-housing-guidance-on-criminal-background-checks-means-for-real-estate; Va. Ass'n of Realtors, *Criminal Background Checks Under the Fair Housing Act* (Nov. 15, 2017).

that the disparate outcome identified by HUD is exactly the outcome intended by the defendants.

58.   The defendants' choice to maintain the overly broad and discriminatory no felony convictions policy also reflects a substantial departure from usual industry practices, which further raises an inference of discriminatory intent.

59.   The defendants' outright rejection of applicants with criminal convictions is entirely counter to normal business practices in the apartment industry. In the normal course of business, landlords and property managers are highly motivated to get people in the door to see their buildings. Even if someone who visits does not become a tenant, word of mouth is an important component of apartment marketing, as visitors may tell other about the building. The defendants' policy instead assures that a group of people who are disproportionately African-American have no reason to visit Montclair at Partridge Creek.

60.   The defendants' elevation of criminal history as an absolute bar to a tenancy without consideration of other eligibility criteria for tenancy is also counter to other normal business practices in the apartment industry. In the normal course of business, consideration of income, prior rental history, credit, and other factors occurs simultaneously during the application process, and after an application has been submitted and reviewed.

61.   Departures like this from industry norms suggest an illegal motive.

62.   In light of these facts, there is no non-discriminatory explanation for why the defendants deliberately chose and continue to implement the no felony convictions policy over an individualized screening practice. Rather, these facts collectively support the inference indeed, they strongly suggest that the defendants fully understand the unnecessary and unlawful disparate impact of their no felony convictions policy on African-Americans, and that they created their policy precisely because of its discriminatory impact. The no felony convictions policy is a tool that defendants intentionally use to minimize the number of

African-Americans residing in their apartment complex in violation of the federal Fair
Housing Act and state law.

63. As a result of the defendants' actions described above, the plaintiff Lamar Lyman has been
directly and substantially injured, because he was denied an apartment, and he was forced
to find alternative housing at a less convenient location.

64.  The plaintiff Lamar Lyman has suffered emotional distress, a loss of enjoyment of
enjoyment of life, and additional expenses as a result.

65. The defendants' discriminatory conduct, if continued, will also deprive others living in and
near Montclair at Partridge Creek the benefit of living in a diverse community.

66. As a result of the defendants' actions described above, the plaintiff Fair Housing Center of
Metropolitan Detroit has been directly and substantially injured. The plaintiff has been
frustrated in its mission to eradicate discrimination in housing and in carrying out the
programs and services it provides, including encouraging intergraded living patterns,
eliminating unlawful barriers in housing, and educating the public about fair housing rights
and requirements.

67. Since becoming increasingly aware of the effects of overbroad and punitive criminal records
screening policies, including thee exclusion of applicants with criminal records without
individualized consideration, as well as the disparate impact such polices have on minority
applicants, the plaintiff Fair Housing Center of Metropolitan Detroit has invested
considerable time and effort in educating the community about the importance of accessible
housing for people with criminal records. As a result of discovering the defendants' policy,
the plaintiff has directed education and counseling efforts to rebutting the impression that
automatic criminal history bans, like the defendants', are permissible.

68.   Because the defendants' No Felony Convictions" policy has had and continues to have the effect of banning people with felony records, who are disproportionately African American, from living at Montclair at Partridge Creek Apartments, the defendants' conduct frustrates the plaintiff Fair Housing Center of Metropolitan Detroit's mission of ensuring equal housing opportunity for all individuals, free of arbitrary barriers.

69.   The plaintiff Fair Housing Center of Metropolitan Detroit has been damaged by having to divert resources that could have been used to provide the aforementioned services to instead identify, investigate, and counteract the defendants' discriminatory conduct.

70.   Specifically, the plaintiff Fair Housing Center of Metropolitan Detroit's staff has expended a significant amount of time investigating the defendants' unlawful policy and practice.

71.   In addition, the plaintiff Fair Housing Center of Metropolitan Detroit has diverted time and money to education and outreach efforts directly and specifically aimed at countering the defendants' discrimination, and discrimination of others like them.

72.   The plaintiff Fair Housing Center of Metropolitan Detroit engaged in each of the aforementioned activities in specific response to the defendants' practices, because they were significantly more egregious and exclusionary that the practices of other housing providers.

73.   But for the need to address the defendants' practices, the plaintiff Fair Housing Center of Metropolitan Detroit would have directed these resources to other efforts to further its mission. Specifically, the time and resources would have been allocated towards its programs aimed at encouraging integrated living patterns, eliminating unlawful barriers in housing, educating the public about fair housing rights and requirements, and providing assistance to individuals and families looking for housing or affected by other discriminatory housing practices. The plaintiff's ability to direct resources to these efforts has been and continues to be reduced because of the need to divert resources to addressing and counteract the defendants' discriminatory No Felony Convictions policy.

14

74. Until redressed and permanently ceased, the defendants' unlawful, dissimilatory action will continue to injure the plaintiff Fair Housing Center of Metropolitan Detroit for example, by:

    a. interfering with efforts and programs intended to bring about equality of opportunity in housing.

    b. requiring the commitment of scarce resources, including staff time and funding, to investigate and counteract defendants' discriminatory conduct thus diverting those resources from the plaintiff's other activities and services, such as education, outreach, and counseling; and

    c. frustrating thee plaintiff's mission and purpose of promoting the equal availability of housing to all persons without regard to their membership in protected categories, including race.

75. The defendants' unlawful actions described herein were, and are, intentional, willful, and malicious, and/or have been, and are, implemented with callous and reckless disregard for the plaintiffs' rights protected under federal and state law.

## Count I:

## Disparate Impact in Violation of the Fair Housing Act, 42 U.S.C. § 3604

76. The plaintiffs restate and realleges as though fully set forth herein paragraphs 1 – 75 of this complaint.

77. The defendants' acts, policies, and practices have an adverse and disproportionate impact on African-Americans. This adverse and disproportionate impact is the direct result of the defendants' no felony convictions policy that automatically denies housing for people with criminal records without considering the applicants' individual characteristics and circumstances.

78.     The defendants' no felony convictions policy was not and is not necessary to serve any substantial, legitimate, nondiscriminatory interest, and any such interest could be satisfied by another practice – providing individualized consideration that would have a less discriminatory effect.

79.     The defendants' acts, policies, and practices constitute discrimination and violate the Fair Housing Act, as amended, 42 U.S.C. § 3604, and implementing regulations, in that:

        a.      The defendants' acts, policies, and practices constitute a refusal to rent housing or negotiate for the rental of housing because of race, and have made housing unavailable because of race, in violation of 42 U.S.C. § 3604(a);

        b.      The defendants' acts, policies, and practices provide different terms, conditions, and privileges of rental housing, as well as different services and facilities in connection therewith, on the basis of race, in violation of 42 U.S.C. § 3604(b); and

        c.      The defendants' notices and statements indicate a preference, limitation, and discrimination based on race in violation of 42 U.S.C. § 3604(c). The defendants' statement in their no felony convictions policy that excludes any person from renting an apartment at Montclair at Partridge Creek because of any criminal conviction has a discriminatory effect on African-Americans because they actually or predictably result in a disparate impact on the basis of race

## Count II:

## Intentional Discrimination in Violation of the Fair Housing Act 42 U.S.C. § 3604

80.     The plaintiffs restate and realleges as though fully set forth herein paragraphs 1 – 79 of this complaint.

16

81.   The defendants' acts, policies, and practices have been carried out with the intention of discriminating on the basis of race.

82.   On information and belief, the defendants are aware of the disparate impact that their no felony convictions policy has on African-Americans. They are also aware of HUD's April 2016 Guidance regarding criminal records based screening policies, including its repudiation of automatic blanket bans and its instructions to adopt less discriminatory approaches to screening, such as individual assessments of criminal histories, that would adequately protect public safety and property concerns.

83.   However, despite this knowledge and awareness, the defendants departed from industry practices and deliberately chose and continue to implement their more discriminatory method for screening on the basis of criminal history. Under theses facts, no legitimate, non-discriminatory explanation exists for the defendants' choice in adopting and maintaining the more discriminatory and exclusionary policy. The defendants selected the no felony convictions policy with the intent and expectation that the policy would disproportionately prevent African-Americans from obtaining housing at Montclair at Partridge Creek.

84.   The defendants' acts, policies, and practices constitute intentional discrimination and violate the Fair Housing Act, as amended, 42 U.S.C. § 3604, and its implementing regulations, in that.

   a.   The defendants' acts, policies, and practices constitute a refusal to rent housing or negotiate for the rental of housing because of race, and have made housing unavailable because of race, in violation of 42 U.S.C. § 3604(a).

   b.   The defendants' acts, policies, and practices provide different terms, conditions, and privileges of rental housing, as well as different services and facilities in connection therewith, on the basis of race, in violation of 442 U.S.C. § 3604(b); and

17

    c.    The defendants' notices and statements indicate a preference, limitation, and discrimination based on race in violation of 42 U.S.C. § 3604(c).

## Count III:

**Disparate Impact in Violation of the Elliott-Larson Civil Rights Act, MCL 37.2502**

85.    The plaintiffs restate and realleges as though fully set forth herein paragraphs 1 –84 of this complaint.

86.    The defendants' acts, policies, and practices have an adverse and disproportionate impact on African-Americans. This adverse and disproportionate impact is the direct result of the defendants' no felony convictions policy, pursuant to which it automatically refuses housing to people with a criminal convictions with no consideration of their individual characteristics and circumstances.

87.    The defendants' no felony convictions policy was not and is not necessary to serve any substantial, legitimate, nondiscriminatory alleged interest, and any such interest could be satisfied by another practice providing individualized consideration that would have a less discriminatory effect.

88.    The defendants' acts, policies, and practices constitute discrimination and violate the Elliott-Larson Civil Rights Act, MCL 37.2502, and its implementing regulations, in that:

    a.    The defendants' acts, policies, and practices constitute a refusal to rent housing or negotiate for the rental of housing because of race, and have made housing unavailable because of race, in violation of MCL 37.2502 (1)(a), (c), and (d)

    b.    The defendants' acts, policies, and practices provide different terms, conditions, and privileges of rental housing, as well as different services and facilities in connection therewith, on the basis of race in violation of MCL 37.2502(1)(b).

18

    c.    The defendants' notices and statements indicate a preference, limitation, and discrimination based on race in violation of MCL 37.2502. The defendants' statement in their no felony convictions policy that excludes any person from renting an apartment at Montclair at Partridge Creek because of criminal history has a discriminatory effect on African-Americans because they actually or predictably result in a disparate impact on the basis of race.

**Count IV:**

**Intentional Discrimination in Violation the Elliott-Larson Civil Rights Act, MCL 37.2502**

89.    The plaintiffs restate and realleges as though fully set forth herein paragraphs 1 – 88 of this complaint.

90.    The defendants' acts, policies, and practices are carried out with the intention of discriminating on the basis of race.

91.    On information and belief, the defendants are aware of the disparate impact that their no felony convictions policy has on African-Americans. They are also aware of HUD's April 2016 Guidance regarding criminal records based screening policies, including its repudiation of automatic blanket bans and its instructions to adopt less discriminatory approaches to screening, such as individual assessments of criminal histories, that would adequately protect public safety and property concerns.

92.    However, despite this knowledge and awareness, the defendants departed from industry practices and deliberately chose and continue to implement their more discriminatory method of screening on the basis of criminal history. Under these facts, no legitimate, non-discriminatory explanation exists for the defendants' choice in adopting and maintaining the more discriminatory and exclusionary policy. The defendants selected the no felony convictions policy with the intent and expectation that the policy would disproportionately

prevent African-Americans from obtaining housing at Montclair a Partridge Creek Apartments.

93.  The defendants' acts, policies and practices constitute intentional discrimination and violate the Elliott-Larson Civil Rights Act, and its implementing regulations, in that:

     a.  The defendants' acts, policies, and practices constitute a refusal to rent housing or negotiate for the rental of housing because of race, and have made housing unavailable because of race, in violation of MCL 37.2502.

     b.  The defendants' acts, policies, and practices provide different terms, conditions, and privileges of rental housing, as well as different services and facilities in connection therewith, on the basis of race, in violation of MCL 37.2502.

     c.  The defendants' notices and statements indicate a preference, limitation, and discrimination based on race, in violation of MCL 37.2502.

## REQUESTED RELIEF

94.  The plaintiffs respectfully ask that this Court grant them the following relief:

(1)  Enter a declaratory judgment finding that the foregoing actions of defendants violate 42 U.S.C. § 3604 and MCL 37.2502;

(2)  Enter a permanent injunction:

(3)  Enjoining the defendants and their directors, officers, agents, and employees from publishing, implementing, and enforcing the illegal discriminatory conduct described herein;

(4)   Directing the defendants and their directors, officers, agents and employees to eliminate their No felony convictions policy, to reduce the adverse and disproportionate effect it causes on the basis of race and make it consistent with the federal Fair Housing Act, the HUD Guidance, and MCL 37.2502.

(5)     Directing the defendants and their directors, officers, agents, and employees to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and prevent additional instances of such conduct or similar conduct from occurring in the future;

(6)     Award compensatory damages to the plaintiffs in an amount to be determined that would fully compensate the plaintiff for injuries caused by the conduct of the defendants alleged herein;

(7)     Award punitive damages to the plaintiffs in an amount to be determined that would punish the defendants for the willful, malicious, and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

(8)     Award the plaintiffs their reasonable attorney's fees and costs under 42 U.S.C. § 3613(c)(2) and MCL 37.2502.

(9)     Award costs and prejudgment interest to the plaintiffs; and

(10)    Order such other relief as this Court deems just and equitable.



Dated: January 18, 2023                    WILLIAM F. PIPER, PLC.
                                           Attorney for Plaintiffs

                                           By: /s/ William F. Piper____
                                               William F. Piper (P38636)
                                           BUSINESS ADDRESS:
                                               1611 West Centre Ave., Ste 209
                                               Portage, Michigan 49024
                                               Phone: 269.321.5008
                                               Fax: 269.321.5009