UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAMAR LYMAN et al.,

                                                          Case No. 23-cv-10131

    Plaintiffs,

v.                                                     HON. MARK A. GOLDSMITH

MONTCLAIR AT PARTRIDGE CREEK,
LLC et al.,

    Defendants.
_____/

**OPINION & ORDER
DENYING DEFENDANTS' MOTION TO DISMISS (Dkt. 14)**

Plaintiffs Lamar Lyman and the Fair Housing Center of Metropolitan Detroit allege that Defendants Montclair at Partridge Creek, LLC and Moceri Management Co, Inc. discriminated against Lyman when he applied to rent an apartment in violation of the Fair Housing Act (FHA), 42 U.S.C. § 3604 and Michigan's Elliott-Larson Civil Rights Act (ELCRA), Mich. Comp. L. § 37.2502. Before the Court is Defendants' motion to dismiss (Dkt. 14). For the reasons that follow, the Court denies Defendants' motion.[1]

**I. BACKGROUND**

Plaintiffs allege that Lyman is an African American man with one felony conviction in his life relating to a domestic dispute with his estranged wife in Texas in March 2011. Am. Compl. ¶ 9. Plaintiffs submit that Lyman "has rehabilitated" since his release from prison in 2018 and has "good credit" for purposes of renting apartments. Id. ¶ 10.

---

[1] Because oral argument will not aid the Court's decisional process, the motion will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). In addition to the motion, the briefing includes Plaintiffs' response (Dkt. 15) and Defendants' reply (Dkt. 16).

1

Plaintiffs allege that Lyman applied for an apartment unit at Montclair in late April or early May 2022. Id. ¶¶ 11–12. Moceri was the company managing Montclair at the time. Id. ¶ 4. Defendants' "regular agent" for performing background checks conducted such a check for Lyman, and that agent found no criminal convictions. Id. ¶ 13.

But then, according to Plaintiffs, one of Defendants' agents performed additional research on Lyman and found his felony conviction online. Id. ¶ 14. On June 9, 2022, "Martha"—an agent of Defendants—informed Lyman that Defendants "could not lease to him because of the results of his criminal background check." Id. ¶ 15. On a separate call with Lyman, Martha allegedly repeated that Defendants "could not lease to him because of the results of his criminal background check." Id. ¶ 17. Martha also told Lyman that "if they deviated from their policy of not accepting anyone with a criminal conviction they would be engaging in discrimination, and they did not consider cases individually." Id. ¶ 18. Additionally, Martha "told Mr. Lyman that otherwise his application was fine, and his criminal conviction was the only reason he was rejected." Id. ¶ 19.

The Fair Housing Center further explored Monclair's policy on August 11, 2022, when an African American "tester" allegedly called Montclair to check on the availability of one- and two-bedroom apartments for her nephew. Id. ¶ 20. The tester informed Defendants' agent—who self-identified as "Andrea"—that the tester's nephew "had a felony that was 22 years old but that since then he had obtained an engineering degree and works at Ford Motor Company." Id. ¶ 24. After learning that the tester's nephew had a criminal conviction, Andrea "asked the tester to hold," and "[a]fter a little while, . . . came back and told the tester that her nephew would not be allowed." Id. ¶¶ 26–27.

Plaintiffs assert that Defendants have a "policy or practice . . . of automatically excluding people with felony convictions from a tenancy [which] is absolute and does not permit exceptions,

2

regardless of the nature of the conviction, the age of it, evidence of rehabilitation or any other factor bearing upon whether the person is a threat to safety or property or has the ability to pay." Id. ¶ 28.

Plaintiffs also cite statistics establishing that individuals with felony convictions are disproportionately represented by African Americans within three geographical areas applicable to Defendants' establishment: the United States, the state of Michigan, and Macomb County.[2]

---

[2] Plaintiffs allege:

> African-Americans are incarcerated at rates that are disproportionate to the numbers in the United States' general population. African-Americans, in 2018, comprised approximately 32.8% of all prisoners, but only makes up approximately 12.00% of the United States' adult population, according to U.S. census Bureau of Justice Statistics.
>
> Furthermore, although only 8% at the United States adult population has a felony conviction, 33% of adult black men have a felony conviction, according to the Vera Institute of justice.
>
> According to the sentencing Project, in "The color of Justice Racial and Ethnic Disparity in State Prisons," Michigan is one of only 12 states where over half the prison population is black.
>
> According to the same study, the white imprisonment rate for the State of Michigan, was 230 per 100,000, while the corresponding rate for African-Americans was 1,682 per 100,000.
>
> In a recent study by the Prison Policy Initiative, there were 1,479 whites incarcerated out of 705,693 whites in Macomb County, while there were 1,028 incarcerated African-Americans out of 72,723 African Americans in Macomb County.
>
> The rate of overrepresentation of whites incarcerated versus whites not incarcerated was 0.64, while the rate of overrepresentation of blacks incarcerated versus blacks not incarcerated was 4.46, according to the same study, with respect to Macomb County.

Am. Compl. ¶¶ 33–38.

On these allegations, Plaintiffs bring disparate-impact claims and disparate-treatment claims under the FHA, 42 U.S.C. § 3604, see id. ¶¶ 82–90, and the ELCRA, Mich. Comp. L. § 37.2502, id. ¶¶ 91–99.

## II. ANALYSIS[3]

The FHA prohibits a person or entity from "mak[ing] unavailable or deny[ing] a dwelling to any person because of race or national origin." 42 U.S.C. § 3604(a). Plaintiffs bring FHA claims based on theories of disparate impact and disparate treatment. The Court addresses each claim in turn.[4]

### A. Disparate-Impact Claim

Per regulations promulgated by the U.S. Department of Housing and Urban Development (HUD), "[l]iability may be established under the Fair Housing Act based on a practice's discriminatory effect." 24 C.F.R. § 100.500. "A practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of" any of specified protected characteristics including "race" and "color." § 100.500(a). The Supreme Court has confirmed

---

[3] To survive a motion to dismiss, a plaintiff must allege "facts that state a claim to relief that is plausible on its face and that, if accepted as true, are sufficient to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The Court is required to "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." Directv, Inc. v. Treesh, 487 F.3d 471, 476 (6th Cir. 2007). The defendant has the burden of showing that the plaintiff has failed to state a claim for relief. Id.

[4] Plaintiffs also assert ELCRA claims under the same theories. Defendants submit that the ELCRA claims "should be dismissed for the same reasons" that the FHA claims should be dismissed and that "Defendants' legal analysis under FHA applies equally to Plaintiffs' Elliott-Larsen claims." Br. in Supp. Mot. at 5 n.3 (citing Mencer v. Princeton Square Apartments, 228 F.3d 631, 634 (6th Cir. 2000) ("In interpreting Michigan's fair housing law, we refer to its federal counterpart for guidance.")). Accordingly, Plaintiffs' ELCRA claims stand or fall with their FHA claims.

that disparate-impact claims are cognizable under the FHA. Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc. (ICP), 576 U.S. 519, 545 (2015).

As Defendants emphasize, see Br. in Supp. Mot. at 18, "a disparate-impact claim that relies on a statistical disparity" requires a showing of "robust causality" between the alleged policy and the disparate impact, ICP, 576 U.S. at 542. Defendants submit the statistics cited in Plaintiffs' amended complaint fall short of this standard. They characterize Plaintiffs' statistics as "[g]eneric" and "overbroad," arguing that these data show nothing more than "fundamental flaws in the criminal justice system." Br. in Supp. Mot. at 18–19. Defendants also correctly note that at least one court has found that "general nationwide statistics" are insufficient to support an FHA disparate-impact claim. Id. at 22 (citing Grays v. Kittredge Co Partners, LLC, No. 12-cv-00208, 2021 WL 1300601, at *2–*4 (D. Colo. Feb. 17, 2021) (recommending dismissal of FHA claim based on denial of plaintiff's housing application due to history of misdemeanor convictions, stating: "Plaintiff's national statistics, without more, are insufficient to plausibly allege this misdemeanor policy had a discriminatory effect on persons of color in Colorado."), report and recommendation adopted sub nom. Grays v. Kittredge Co. Partners, LLC, No. 20-cv-0208, 2021 WL 1015984 (D. Colo. Mar. 17, 2021)).

However, even countrywide statistics may be sufficient to plead a disparate impact claim where a challenged policy has a clearly disproportional effect on a protected class. See Sams v. Ga W. Gate, LLC, No. C415-282, 2017 WL 436281, at *1–*2, *4–*5 (S.D. Ga. Jan. 30, 2017) (denying motion to dismiss FCA disparate impact claim where defendants "barred from residency any individual who had certain felony or misdemeanor convictions" in complexes where African Americans resided but not in other complexes, explaining: "Plaintiffs have provided evidence that African Americans are twice as likely to have criminal convictions as are Caucasians. . . . Plaintiffs

5

have also alleged that in 2014, African Americans represented 36% of the prison population in the United States but only 12% of the country's total population. . . . This is sufficient to avoid a motion to dismiss.").

Regardless, Plaintiffs' pleading relies on more than national statistics. Plaintiffs cite state-level data, asserting that over half of Michigan's prisoner population is African American, that Michigan's white imprisonment rate is 230 per 100,000, and that Michigan's African American imprisonment rate is 1,682 per 100,000. Am. Compl. ¶¶ 35–36. And Plaintiffs cite county-level data, pointing to findings that 1,479 out of 705,693 white people in Macomb County are incarcerated while 1,028 out of 72,723 African Americans in Macomb County are incarcerated. Id. ¶¶ 37–38.

The weight of caselaw strongly indicates that—by pointing to local statistics showing that African Americans are significantly more likely to have a history of incarceration in the specific state and county where Defendants are located—Plaintiffs have plausibly pleaded that Defendants' alleged policy of excluding all applicants with felony convictions has a disparate impact on African Americans. See, e.g., Louisiana Fair Hous. Action Ctr. v. Azalea Garden Props., LLC, No. 22-74, 2022 WL 1262642, at *1, *5 (E.D. La. Apr. 28, 2022), amended on reconsideration in part, No. 22-74, 2022 WL 2165415 (E.D. La. June 9, 2022) (denying motion to dismiss as to disparate impact claim where plaintiff alleged that defendant "exclude[d] all applicants with any criminal history" and that "statistics show[ed] that a disproportionate number of African Americans are arrested and incarcerated in the United States when compared to white persons, and that this trend is particularly true at the local level in Jefferson Parish where [defendant was] located," explaining that "[t]he statistical data cited by [plaintiff], which the Court also accepts as true at this stage, makes this allegation plausible") (emphasis in original); Jackson v. Tryon Park Apartments, Inc.,

6

No. 18-cv-06238, 2019 WL 331635, at *2–*5 (W.D.N.Y. Jan. 25, 2019) (denying motion to dismiss FHA disparate impact claim where Black plaintiff alleged that his rental application was denied "due to a felony" on his record where "[e]mpirical evidence show[ed] that nationally, and in New York State, blanket bans on eligibility, based on criminal history, result in the denial of housing opportunities at a disproportionate rate for African Americans and minorities") (punctuation modified); Alexander v. Edgewood Mgmt. Corp., No. 15-01140, 2016 WL 5957673, at *1–*2, *4 (D.D.C. July 25, 2016) (denying motion to dismiss disparate impact claim where African American plaintiff—who had a felony conviction and a misdemeanor conviction on his record—was denied access to housing due to "unsatisfactory" criminal record, and rejecting argument that plaintiff improperly relied on statistical data for incarceration rates representing "entire Washington D.C. metropolitan area").⁵

---

⁵ Defendants cite a case in tension with this trend: Carson v. Hernandez, where a magistrate judge recommended finding that a pro se plaintiff had not plausibly alleged an FHA violation based on a defendant's alleged rejection of applicants with felony convictions. No. 3:17-cv-1493, 2018 WL 5624198, at *2–*3 (N.D. Tex. July 26, 2018). This case has limited persuasive value for multiple reasons. First, though the district court accepted the recommendation and dismissed the plaintiff's claims upon "a de novo review of that portion of the Report to which objection was made," it is not clear from the district court's order what the pro se plaintiff's objections were or whether the court made a de novo decision as to any issue relevant to the questions before this Court. No. 17-cv-1493, 2018 WL 5620513, at *1 (N.D. Tex. Oct. 30, 2018). Second, the magistrate judge suggested that the plaintiff was required to show that the defendant's policy caused the disproportionate distribution of the disqualifying characteristic—i.e., that a housing policy caused a disparate rate of felony convictions in the African American population. See Carson, 2018 WL 5624198, at *2 ("[A] policy of excluding convicted felons from tenancy did not cause the underlying disparity Plaintiff cites, to-wit, the historical disproportion of African Americans convicted of felony offenses in the United States."). This characterization misstates the law. The causal component of a disparate-impact claim requires that a plaintiff allege that the challenged practice disproportionately impacted the availability of the benefit to the protected class. See Anderson v. City of Blue Ash, 798 F.3d 338, 364 (6th Cir. 2015) ("Plaintiffs alleging disparate-impact claims under the [FHA] must first show that defendant's actions caused [protected] individuals to suffer disproportionately more than other individuals.") (punctuation modified).

Defendants find other faults with Plaintiffs' statistics: (i) the statistics do not show whether the no-felons rule "resulted in a disparate impact at Montclair," Br. in Supp. Mot. at 19; and (ii) in Defendants' view, a proper statistical analysis requires utilizing a financially qualified applicant pool, not a data set consisting of all convicted felons, id. at 19–20. Defendants may well be right that Plaintiffs' statistical analysis will prove vulnerable or even fatally defective. But such an inquiry is highly fact-intensive and inappropriate for resolution at the motion-to-dismiss stage.

Defendants' caselaw reinforces the appropriateness of allowing this case to proceed to discovery. Many of the cases cited by Defendants in support of their challenge to Plaintiffs' statistics were decided at the summary judgment stage or at trial. See Br. in Supp. Mot. at 20–21 (citing Mencer, 228 F.3d at 635 (affirming grant of judgment as a matter of law to defendant apartment complex following bench trial where plaintiff mixed-race couple could not make out prima facie discrimination case because they were "not financially qualified to rent according to defendant's policies")). One of Defendants' summary judgment cases on this point actually lends support to Plaintiffs' disparate-impact claim. See Reply at 4 (citing Fortune Soc'y v. Sandcastle Towers Hous. Dev. Fund Corp., 388 F. Supp. 3d 145, 177 (E.D.N.Y. 2019) (granting summary judgment to defendant apartment owners and manager on theory that blanket ban of applicants with criminal convictions constituted intentional discrimination, but denying summary judgment to defendants on disparate-impact claim)).

Defendants repeatedly refer to Graoch Assocs. # 33 v. Louisville/Jefferson Cnty., where the United States Court of Appeals for the Sixth Circuit affirmed a grant of summary judgment to the defendant owner of an apartment complex on plaintiffs' claim that the owner's withdrawal from a "Section 8" rent-subsidy program had a disparate impact on minority residents under the FHA. 508 F.3d 366, 378–379 (6th Cir. 2007). The court explained that plaintiffs had "not

8

presented any data regarding the total tenant pool" affected by the withdrawal. Id. (stating that plaintiff "ha[d]not even alleged—and very likely could not show—that [defendant's] withdrawal from Section 8 harmed a disproportionate percentage of the black tenants at" the complex). In contrast, in this case, Plaintiffs have adequately presented "data regarding the total tenant pool" at the pleading stage by isolating data on residents of Michigan and Macomb County and alleging that Defendants' policy "harm[s] a disproportionate percentage" of African Americans. Id.

Additionally, Defendants point to a case where plaintiffs failed to state a Title VII employment-discrimination claim based on an employer's exclusion of applicants with certain criminal backgrounds where plaintiffs relied on "national arrest or incarceration statistics" and there was "good reason to think that these national statistics [were] not representative of the qualified applicant pool." Mandala v. NTT Data, Inc., 975 F.3d 202, 211, 205 (2d Cir. 2020) (emphasis in original). However, as this Court has explained, Plaintiffs here do not rely exclusively on national statistics. Their reference to demographic data in the specific state and county where Defendants do business suffices to plead that the challenged policy has a disproportionate impact on a protected class. See Azalea Garden, 2022 WL 1262642, at *5–*6; Jackson, 2019 WL 331635, at *2–*5; Sams, 2017 WL 436281, at *4–*5; Alexander, 2016 WL 5957673, at *4.

Defendants also argue that Plaintiffs' pleadings are insufficient because they do not pass muster under the burden-shifting framework of McDonnell Douglas.[6] See Br. in Supp. Mot. at 17;

---

[6] To assess the merits of "disparate-impact claims against private defendants under the FHA," courts apply "a form of the McDonnell Douglas burden-shifting framework," which consists of three steps:

> First, a plaintiff must make a prima facie case of discrimination by identifying and challenging a specific housing practice, and then showing an adverse effect by

9

Reply at 3–6. But courts do not employ the McDonnell Douglas test until the summary judgment stage, and it is error to hold Plaintiffs' pleadings to that standard. See Swierkiewicz v. Sorema N. A., 534 U.S. 506, 510–511 (2002) (finding that plaintiff bringing employment-discrimination suit was not required to allege specific facts establishing a prima face case of discrimination under McDonnell Douglas); Keys v. Humana, Inc., 684 F.3d 605, 609 (6th Cir. 2012) ("[I]t was error for the district court to require [plaintiff] to plead a prima facie case under McDonnell Douglas in order to survive a motion to dismiss . . . ."); Williams v. Huron Pines Condo. Ass'n, No. 21-cv-10878, 2022 WL 822106, at *8 (E.D. Mich. Mar. 17, 2022) (denying motion to dismiss FHA claim where parties "put the cart before the horse" by presenting arguments under McDonnell Douglas at pleading stage).

Finally, Defendants consider the "most glaring and fatal flaw" in Plaintiffs' complaint to be their "failure to specify the details of the policy they say should have been followed," implying that Plaintiffs' challenge to a blanket ban of all felon applicants is facially insufficient. Br. in Supp. Mot. at 21–22. Defendants again cite Mandala, where the court took issue with plaintiffs' "fail[ure] to identify the precise contours of [defendants' hiring] policy itself," noting that plaintiffs "equivocate[d] as to whether the policy covers any prior criminal conviction or only felony

---

offering statistical evidence of a kind or degree sufficient to show that the practice in question has caused the adverse effect in question . . . .

Second, if the plaintiff makes a prima facie case, the defendant must offer a legitimate business reason for the challenged practice . . . .

Third, if the defendant offers such a reason, the plaintiff must demonstrate that the defendant's reason is a pretext for discrimination, or that there exists an alternative housing practice that would achieve the same business ends with a less discriminatory impact.

Graoch, 508 F.3d at 374 (punctuation modified) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) (explaining burden-shifting approach in context of Title VII claim)).

convictions." 975 F.3d at 206. There is no such equivocation here; Plaintiffs allege that Defendants have a categorical policy of rejecting applicants with felony convictions. See, e.g., Am. Compl. ¶ 28.

Defendants also cite another case that addressed plaintiffs' efforts to make out a prima facia discrimination case only after the opportunity for discovery. See Br. in Supp. Mot. at 21–22 (citing Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 647–648 (1989) (affirming rejection of Title VII disparate-impact claim following bench trial based on employer's practices that allegedly resulted in "racial stratification of the work force"). None these authorities requires Plaintiffs to further specify their proposed alternative to Defendants' existing policy.

Plaintiffs have adequately alleged that Defendants' purported practice of rejecting all applicants with felony convictions violates the FHA due to its disparate impact on African Americans in Macomb County. Defendants will have the opportunity to defeat Plaintiffs' claims under McDonnell Douglas—for example, by challenging Plaintiffs' prima facie case at step one, and by "offer[ing] a legitimate business reason for the challenged practice" at step two. Graoch, 508 F.3d at 374 (punctuation modified). But at the pleading stage, the Court denies Defendants' motion to dismiss as to Plaintiffs' FHA disparate-impact claim.

### B. Disparate-Treatment Claim

To adequately plead a disparate-treatment claim under the FHA, Plaintiffs must "allege intentional discrimination." Williams, 2022 WL 822106, at *8 (citing HDC, LLC v. City of Ann Arbor, 675 F.3d 608, 612 (6th Cir. 2012)). Plaintiffs can support such a claim "either through direct evidence of intentional discrimination or th[r]ough circumstantial evidence using the burden-shifting framework first articulated in McDonnell Douglas . . . ." HDC, 675 F.3d at 612. Allegations survive a motion to dismiss if they "give rise to a reasonably founded hope that the

11

discovery process will reveal relevant evidence to support their claim of disparate treatment." Id. (punctuation modified).

Plaintiffs allege that "[s]everal factors strongly indicate that the real reason the defendants adopted the no felony convictions policy was . . . to reduce the number of African-American people who are eligible to become tenants." Am. Compl. ¶ 57. They rely on circumstantial evidence, pointing to Defendants' "research regarding Mr. Lyman's felony convictions beyond the contracted agent's initial background check," id.—i.e., Defendants' additional investigation into Lyman's background undertaken after their initial check came up negative, id. ¶¶ 13–14. In Plaintiffs' view, this "departure from normal procedures suggests intentional discrimination" and allows for the inference that Defendants "did not like the way Mr. Lyman looked." Br. in Supp. Resp. at 4.

Plaintiffs also submit that Defendants' "outright rejection of applicants with criminal convictions is entirely counter to normal business practices in the apartment industry," and they correctly note that HUD has issued guidance discouraging the application of a blanket ban based on a certain type of conviction without a tailored review of the nature and severity of an individual conviction. Am. Compl. ¶¶ 57, 64.[7] In Plaintiffs' view, "[d]epartures like this from industry norms

---

[7] Plaintiffs refer to HUD's April 4, 2016 guidance, entitled "Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions" (Dkt. 14-4). Courts have identified this guidance as an interpretive rule with persuasive value. See, e.g., Jackson, 2019 WL 331635, at *4. The guidance states in part:

> [H]ousing providers that apply a policy or practice that excludes persons with prior convictions must still be able to prove that such policy or practice is necessary to achieve a substantial, legitimate, nondiscriminatory interest. A housing provider that imposes a blanket prohibition on any person with any conviction record—no matter when the conviction occurred, what the underlying conduct entailed, or what the convicted person has done since then—will be unable to meet this burden. . . .

suggest an illegal motive." Id. ¶ 66.  Contending that "word of mouth is an important component of apartment marketing," Plaintiffs allege that, by design, Defendants' policy "assures that a group of people who are disproportionately African-American have no reason to visit Montclair at Partridge Creek. . . ." Id. ¶ 64.

These allegations plausibly provide "a reasonably founded hope that the discovery process will reveal relevant evidence to support [Plaintiff's] claim of disparate treatment." HDC, 675 F.3d at 612 (punctuation modified).  At the very least, Plaintiffs have plausibly alleged that Defendants were aware that their ban on felons disproportionately excluded African American applicants and that Defendants intended to achieve this result.  Other courts have found similar theories sufficient to state a claim of intentional discrimination, considering that "the impact of an official action is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions."  Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 563–565 (3d Cir. 2002) (punctuation modified) (finding that complaint "alleg[ing] that [defendant athletic association] purposefully adopted a policy because that policy would reduce the number of black athletes who could receive athletic scholarships and compete . . . d[id] sufficiently state facts showing intentional, disparate treatment on account of race") (citing Fed. R. Civ. P. 9(b) ("Malice,

---

> A housing provider with a more tailored policy or practice that excludes individuals with only certain types of convictions must still prove that its policy is necessary to serve a "substantial, legitimate, nondiscriminatory interest." . . .
>
> A policy or practice that fails to take into account the nature and severity of an individual's conviction is unlikely to satisfy this standard.  Similarly, a policy or practice that does not consider the amount of time that has passed since the criminal conduct occurred is unlikely to satisfy this standard, especially in light of criminological research showing that, over time, the likelihood that a person with a prior criminal record will engage in additional criminal conduct decreases until it approximates the likelihood that a person with no criminal history will commit an offense.

4/4/16 HUD Guidance at 6–7.

13

intent, knowledge, and other condition of mind of a person may be averred generally.")); see also Inclusive Communities Project, Inc. v. United States Dep't of Treasury, No. 3:14-cv-3013, 2016 WL 6397643, at *14–*15 (N.D. Tex. Oct. 28, 2016) (finding that allegations that federal tax-credit program "was being administered in a way that resulted in a discriminatory effect" because "projects were being disproportionately located in racially segregated locations" were "sufficient to plausibly allege discriminatory intent" under the FHA and other causes of action); S. Camden Citizens in Action v. N. J. Dep't of Env't Prot., 254 F. Supp. 2d 486, 495–499 (D.N.J. 2003) (finding that, "at the early stage of [the . . .] case where a record ha[d] not yet been developed," plaintiffs had adequately alleged Title VI and Equal Protection claims on theory that state defendants who had granted permits "concentrating a disproportionate amount of air pollution" in communities of color "may have intended invidious discrimination").

Plaintiffs are also correct that "factors indicative of a discriminatory animus include . . . 'departures from the normal procedural sequence.'" S. Camden, 254 F. Supp. 2d at 496 (quoting Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 267 (1977) (considering alleged discriminatory intent behind denial of request to rezone property to allow for multiple-family housing)). Plaintiffs' allegation that Defendants departed from their usual procedure when they conducted an additional investigation of Lyman's background—after an initial finding that his criminal history satisfied Montclair's requirements—supports their disparate-treatment claim. When considered together, Defendants' alleged procedural departure and their purported commitment to an across-the-board rejection of felons in a county where felons are disproportionately African American—all in defiance of alleged industry norms and HUD guidance to the contrary—suffice to state a disparate-treatment claim under the FHA.

14

Defendants argue that Plaintiffs have failed to make out a prima facie case under the McDonnell Douglas standard, and they continue to rely on caselaw assessing FHA claims under the burden-shifting approach that is applicable only after plaintiffs have the opportunity for discovery.[8] Again, Defendants have "put the cart before the horse." Williams, 2022 WL 822106, at *8 (denying motion to dismiss FHA disparate-treatment claim). Defendants may be able to prevail under a McDonnell Douglas burden-shifting analysis, but a review of "that evidence would be premature for the Court to consider at the motion to dismiss stage." Id. at *9.

The Court denies Defendants' motion to dismiss as to Plaintiffs' FHA disparate-treatment claim. Plaintiffs' FHA claims survive, and because their ELCRA claims stand or fall with their FHA claims, their ELCRA claims survive, too. See Br. in Supp. Mot. at 5 n.3 (citing Mencer, 228 F.3d at 634).[9]

---

[8] See Br. in Supp. Mot. at 7–11, 15–16 (citing Mencer, 228 F.3d at 634–635; Sutton v. Piper, 344 F. App'x 101 (6th Cir. 2009) (affirming grant of summary judgment to defendants on pro se plaintiff's FHA claims); Smith v. U. S. Dep't of Hous. & Urb. Dev., No. 1:22-cv-0788, 2022 WL 18107588, at *2 (W.D. Mich. Dec. 30, 2022), report and recommendation adopted, No. 22-cv-788, 2023 WL 34554 (W.D. Mich. Jan. 4, 2023) (assessing pro se plaintiff's prima facie case for FHA claim under summary judgment standard); Miller v. McKinley Inc., No. 05-40310, 2007 WL 2156273 (E.D. Mich. July 26, 2007) (granting summary judgment to defendant where plaintiff failed to make out prima facie FHA disparate-treatment claim)); Reply at 1 (citing Arendale v. City of Memphis, 519 F.3d 587, 590 (6th Cir. 2008) (affirming grant of summary judgment to municipal defendant on discrimination claims brought under 42 U.S.C. §§ 1981 and 1983 and Title VII)).

To the extent that Defendants' cases were decided at the pleading stage, they concerned distinguishable issues and are unpersuasive in the context of the questions before this Court. See HDC, 675 F.3d at 612 (affirming dismissal of FHA disparate-treatment claim based on theory that defendant city discriminated against disabled individuals when city triggered option to terminate agreement with plaintiff developers where allegations did "not plausibly support a finding that [city] 'designed' the option agreement to fail by intentionally including a condition it knew or should have known the developers could not meet"); Talley v. Lane, 13 F.3d 1031, 1033 (7th Cir. 1994) (affirming sua sponte dismissal of pro se complaint alleging unlawful discrimination on basis of disability and criminal record).

[9] Defendants also argue that the Fair Housing Center has no claim under the FHA because "[a]ny Housing Center claim would be derivative of Lyman's claim," which Defendants consider

15

### III.  CONCLUSION

For the reasons explained above, the Court denies Defendants' motion to dismiss (Dkt. 14).

SO ORDERED.

Dated: September 18, 2023　　　　　　　　　　　s/Mark A. Goldsmith
　　　　　Detroit, Michigan　　　　　　　　　　　MARK A. GOLDSMITH
　　　　　　　　　　　　　　　　　　　　　　　United States District Judge

---

meritless.  Br. in Supp. Mot. at 16.  Plaintiffs insist that the Fair House Center has standing to bring suit based on its allegations of having diverted resources to respond to Defendants' allegedly illegal policies.  Br. in Supp. Resp. at 6–7 (citing Am. Compl. ¶¶ 72–80; Hous. Opportunities Made Equal, Inc. v. Cin. Enquirer, a Div. of Gannett Co., 943 F.2d 644, 646 (6th Cir. 1991) (finding that organization with purpose of "eliminat[ing . . .] unlawful racially discriminatory housing practices" had standing to bring FHA claim where it alleged that it was forced "to devote resources to investigate and negate the impact" of allegedly discriminatory practices)).  Defendants' reply does not address this argument, which the Court finds meritorious.  The Court declines to dismiss the Fair Housing Center's claims.